# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| TERREBONNE'S, LLC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 4:25-cv-499 |
| v. | § | |
| JESSE GIBSON AND THE WILD | § | |
| CAUGHT CAJUN, LLC D/B/A | § | |
| THE WILD CAJUN | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Terrebonne's, LLC files this Original Complaint against Defendants Jesse Gibson and The Wild Caught Cajun LLC d/b/a The Wild Cajun and would respectfully show the Court as follows:

## I.  PARTIES

1.      Plaintiff Terrebonne's, LLC ("Plaintiff," "Terrebonne's," or "Company") is a Texas limited liability company with its principal place of business at 7914 Camp Bowie W Boulevard, Fort Worth, Texas 76116.

2.      Defendant Jesse Gibson ("Gibson") is an individual residing at 7358 Winnell Way, North Richland Hills, Texas 76180-8225. Gibson may be served at that address or wherever he may be found.

3.      Defendant The Wild Caught Cajun LLC ("WCC") is a Texas limited liability company that does business as The Wild Cajun. WCC may be served by serving its registered agent (and owner, sole director, sole member, and manager) Jesse Gibson at his

above- listed address, or at the address provided to the Texas Secretary of State, 937 Lost Heather Dr., Saginaw, TX 76179-1521, or wherever he may be found. Alternatively, pursuant to FED. R. CIV. P. 4(h)(1)(B) and TEX. BUS. ORGS. CODE § 5.251, WCC may be served (a) by delivering a copy of the summons and of this complaint to any officer, managing or general agent, or other agent authorized by appointment or by law to receive service of process, or (b) through service on the Texas Secretary of State as agent for service of process.

## II. JURISDICTION AND VENUE

4.     This action arises in part under the Trademark Act of 1946 (the "Lanham Act"), 15 U.S.C. § 1051 et seq., including 15 U.S.C. § 1125(a)(1) and § 1125(d)(1). This Court therefore has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

5.     The Court has supplemental jurisdiction over the Texas state-law claims under 28 U.S.C. § 1367(a) because those claims arise out of the same nucleus of operative facts.

6.     The Court has personal jurisdiction over Defendants because they reside in and purposefully direct their unlawful conduct toward residents of this judicial district. A substantial part of the events giving rise to the claims occurred and are occurring in the Fort Worth Division of the Northern District of Texas.

7.     Venue is proper in this District and Division under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts complained of occurred here and Defendants reside here.

## III. FACTUAL BACKGROUND

### A. INTRODUCTION

8.      Terrebonne's owns and operates Terrebonne's Restaurant & Bar, a popular restaurant and catering business in Fort Worth, Texas, serving Cajun and Creole cuisine. Its website went live in January 2025 (*see* screenshot below), and it opened on February 1, 2025. During that time, it has continuously used the distinctive Terrebonne's name and logo (collectively, the "Marks") in interstate and intrastate commerce, spending substantial sums to build goodwill, reputation, and customer recognition.



9.      As a result of that continuous and exclusive use, the Marks have acquired common-law trademark rights throughout DFW area and beyond. Consumers associate the Marks exclusively with Terrebonne's and its high-quality products and services.

### B. TERREBONNE'S FORMATION, BUSINESS, AND MARKS

10.      On or about April 4, 2024, Phillip "Phil" Tullis, as organizer and sole manager, filed the Certificate of Formation for Terrebonne's LLC.

11.     On or about September 1, 2024, Tullis circulated the Company's Business Plan and discussed it with Gibson and the other future members. The Business Plan specified: "The owners will be contributing certain inventory, equipment, vehicles and large existing customer bases. A small group of private investors will provide the immediate cash necessary to begin operations."

12.     On or about October 17, 2024, the IRS issued an EIN number to the Company.

13.     On or about December 2, 2024, the members filed a Certificate of Amendment to add members, including WCC, and to designate that the Company would proceed as a Member-Managed entity.

14.     On December 5, 2024, the members of Terrebonne's, including WCC, executed the "COMPANY AGREEMENT OF TERREBONNE'S, LLC, A Texas Limited Liability Company" (hereafter, "Company Agreement"). Gibson signed the Company Agreement on behalf of WCC.

15.     Various members made various contributions to acquire their respective membership interests. For example, the Kay Ellen Management Group LLC contributed $150,000 for its 40% interest in the Company. By contrast, Gibson did not contribute any cash. Rather, he agreed to provide equipment and vehicles. The Members, including WCC, understood and agreed that Gibson would contribute for the Company's exclusive use a box truck valued at approximately $10,000, and boiling equipment, including propane bottles and other accessories, valued at approximately $7,000. Paragraph 3.10.2 of the Company Agreement reflects the intent of the Company to operate a restaurant for the

benefit of all members, details Gibson's specific responsibilities in connection therewith, and provides for Gibson to earn additional 1099 income of up to $5,000 per month as the Operations Manager, whereby he would be responsible to "generally handle most aspect[s] of the Company's operations …" and would be compensated for his "efforts in operating the business in the Premises," i.e., at the Camp Bowie location. Thus, by executing the Company Agreement and by virtue of his status as a Member, Gibson agreed to dedicate his efforts to the successful operation of the restaurant and, for additional compensation, to serve as Operations Manager.

## C.    GIBSON'S ERRATIC BEHAVIOR LEADS TO HIS TERMINATION

16.    Gibson, through his entity WCC, is a member of Terrebonne's, LLC and at times had access to Terrebonne's confidential information, funds, and property. As described below, he has since misused, for his own benefit and financial gain, such confidential information, funds, and property. Indeed, Gibson's misbehavior during his three months of employment was varied and persistent.

17.    At various times during February and March 2025, Gibson purchased seafood supplies on behalf of Terrebonne's, using an account in the name of The Wild Cajun but paid for that product with a Terrebonne's check. For example, in early April, he made a significant purchase of approximately $11,000 of seafood product on behalf of Terrebonne's and using a Terrebonne's check to pay for the order.

18.    On multiple occasions, Gibson was asked to provide a complete and accurate inventory of all Company seafood held in freezers at his home. On information and belief, he never provided one. To the contrary, a few days before his termination (described

below), the Company's Kitchen Manager went to Gibson's home and photographed the contents in Gibson's freezers, which did not match up with the deficient inventory previously provided by Gibson. Those photos confirmed that Gibson was in possession of seafood worth approximately $18,000—all of which was purchased by the Company, and none of which has been returned.

19.    Additionally, shortly after opening the restaurant, Gibson began to act erratically and unprofessionally—behavior for which he was repeatedly admonished.

20.    As evidenced by various text messages and voicemails, he has physically threatened one of its managers and multiple employees.

21.    In early March, Gibson was suspended because of his unprofessional and erratic behavior. He was allowed to return a few days later on probationary basis, based on a promise from Gibson to correct his behavior and subject to a reduction of his monthly income from $5,000 to $4,000.

22.    On March 10, 2025, he threatened to physically assault one of the co-owners.

23.    On April 5, 2025, he threatened to murder one of the co-owners – in an angry rant that was captured on video and witnessed by multiple people.

24.    On April 7, 2025, pursuant to a vote of the Majority of Interest of the Owners, Gibson was removed and terminated from his position as Operations Manager, as expressly contemplated and permitted by Paragraph 3.10.2 of the Company Agreement.

## D.    DEFENDANTS' UNLAWFUL CONDUCT POST-TERMINATION

25.    Since his termination as an employee and while still owing fiduciary duties to the Company, Gibson embarked on a personal scheme to compete against Terrebonne's,

misappropriate its property, divert Company revenues to himself, trade on Terrebonne's valuable Marks, and threaten Terrebonne's staff with physical harm.

26.    For example, on April 8, 2025, just after midnight, he broke into the Company's property on Camp Bowie Blvd. (where management had just changed the locks) and stole, at a minimum, six propane bottles and twelve cartons of shrimp, collectively valued at approximately $1,000. He has since used that equipment to generate revenues for himself – revenues that he has not reported to, or shared with, Terrebonne's.

27.    At least as early as April 11, 2025, Gibson used a "Terrebonne's Crawfish & Retail" Facebook page to encourage his followers to download and use the Terrebonne's app (which advertises under the Terrebonne's name and logo), while simultaneously acknowledging (in the fine print) that he is "not associated with terrebonnes restaurant and bar at this time ….":



28.    On or about April 11, 2025, he retained at least $2,700 in gross revenue from a crawfish boil for which Terrebonne's had contracted with Terrebonne's client, Fort Worth Realtors Association.

29.    On information and belief, he retained another $1,200 from a catering event at Birdies, $500 from a Ring of Fire event, and another $500 of petty cash he took and did not pay back.

30.    On Saturday, April 12, 2025, he threatened another individual working for Terrebonne's.

31.    Because of his unhinged behavior and threats of physical violence, the Company or its employees have been forced to submit multiple police reports, including to the Fort Worth Police Department and The Colony Police Department.

32.    Additionally, he has unlawfully and defiantly used and infringed Plaintiff's Marks. For example, on April 14, 2025, Gibson posted to social media regarding a "DFW Crawfish Deal" – using Plaintiff's name and logo, while directing consumers to a competing website:





Notably, he stated that "some of *our* processes have changed" (emphasis added) – an intentionally deceptive advertisement designed to mislead consumers about the source of the goods and his continuing affiliation with Plaintiff, even though he is no longer employed by Terrebonne's and is not authorized to act on behalf of Terrebonne's. The DFW Crawfish Deals account has more than 26,000 followers.

33.     Gibson has retained possession of, and refuses to return, the Company's box truck for which Terrebonne's recently paid $3,500 in repairs.

34.     Gibson has retained possession of, and refuses to return to Terrebonne's, approximately $18,000 of seafood products/inventory that the Company purchased and

which Gibson agreed to warehouse in one of his many freezers and store for the use and benefit of Terrebonne's, including these oysters and snow crab:



35.    Gibson has admitted to using some of the Company's inventory for a crawfish boil he performed for a friend. Gibson did not reimburse the Company, nor did he report or deliver such revenues to the Company.

36.    He has made various social media posts criticizing Terrebonne's management. He has also contacted multiple Terrebonne's employees and encouraged them to leave Terrebonne's and to seek employment at other competing restaurants.

37.    At some point, Gibson changed his Facebook landing page from "The Wild Cajun" to "Terrebonne's Crawfish & Retail," without seeking or securing permission to do

so from Plaintiff. Gibson has advertised extensively on social media and on a Terrebonne's

app, using the Company's Marks, without authorization:




38.    A simple Google search of "Terrebonne's" produces confusing results that

include Plaintiff's restaurant ("Terrebonne's Restaurant & Bar") *and* a Facebook page run

by Defendants ("Terrebonne's – Crawfish & Retail (The Wild Cajun)") (shown below):



39.     Gibson is even using Terrebonne's name to divert business to a competing restaurant just 2.2 miles down the road called The Horny Toad, where he criticizes Terrebonne's current "BYOB" environment and advertises his involvement with a Crawfish Boil at The Horny Toad:



40.    Defendants' actions have already resulted in significant and verifiable revenue losses. By way of example, for the weekend of April 11-13, Terrebonne's can document decreased revenue of 30% compared to the previous three weekends.

41.    On or about April 13, 2015, Gibson defiantly stated to one of Terrebonne's managers that he has no intention of stopping his use of Terrebonne's name or logo.

42.    By letter of April 23, 2025, from the undersigned to Mr. Gibson, Plaintiff demanded that Defendants cease these activities. That letter was hand-delivered to Gibson by a certified process server.

43.    In continued and willful violation of Plaintiff's rights, Defendants have ignored the warnings.

44.    For example, he used Terrebonne's name and logo to advertise and sell crawfish for his own personal gain on April 24, 2025, encouraging followers to use the Terrebonne's app and diverting business to his personal website at www.TheWildCajun.com:



45.     As recently as May 2, 2024, Defendants used Plaintiff's name and logo on social media to advertise and conduct a "WEEKEND GIVEAWAY" promotion, whereby one "Terrebonne's" customer could win a "FREE" 30-lb. bag of crawfish:



In fact, Terrebonne's was not involved in any such promotion, and Defendants were not authorized to run any such promotion on behalf of Terrebonne's or using Terrebonne's name or logo.

46.     Defendants' conduct is willful, intentional, and undertaken with full knowledge of Terrebonne's prior rights in the Marks and Gibson's fiduciary and contractual obligations.

47.     In sum, Defendants have, without authority, permission, or legal basis:

    a.    Used Terrebonne's name and logo in commerce and on various social media platforms, including operating a Facebook page entitled "Terrebonne's – Crawfish & Retail";

    b.    Developed and promoted a mobile application that displays and uses the Marks;

    c.    Advertised and sold crawfish and other food from Gibson's residence in North Richland Hills, Texas, in violation of various municipal codes and regulations;

    d.    Provided catering services to at least one of Terrebonne's clients—the Fort Worth Realtors Association—collecting approximately $2,700 that rightfully belongs to Terrebonne's and refusing to remit those funds to Terrebonne's;

    e.    Stolen seafood inventory and other valuable property belonging to Terrebonne's;

    f.    Removed or embezzled from Terrebonne's cash and other company funds for personal use; and

    g.    Threatened Terrebonne's employees.

48.    Defendants' wrongful acts fall within, and continue to violate, each of the following categories enumerated in Terrebonne's April 23, 2025 cease-and-desist letter:

    a.    Using Terrebonne's name in an unauthorized manner;

    b.    Using Terrebonne's logo in an unauthorized manner;

    c.    Unlawfully conducting business under the name "Terrebonne's";

    d.    Advertising and suggesting an affiliation with, sponsorship by, and endorsement by Terrebonne's;

    e.    Wrongfully withholding monies earned using Terrebonne's Marks, funds, and property;

    f.    Deceptively operating or posting to the "Terrebonne's – Crawfish & Retail" Facebook page; and

    g.    Deceptively operating an iPhone and Android app that uses Terrebonne's name or logo.

49.    Unless enjoined, Defendants will continue to infringe, misappropriate, and damage Terrebonne's Marks, relationships, reputation, and goodwill.

## IV. CAUSES OF ACTION

## COUNT ONE – Trademark Infringement & False Designation (15 U.S.C. § 1125(a)(1)(A))

50.    Terrebonne's realleges paragraphs 1-49.

51.    Defendants' unauthorized use of the Marks in commerce is likely to cause confusion, mistake, or deception as to the source, sponsorship, affiliation, or approval of Defendants' goods and services, in violation of 15 U.S.C. § 1125(a)(1)(A). In fact, Defendants' actions have already led to actual confusion amongst consumers.

52.    Plaintiff has been damaged thereby and is entitled to pursue all available remedies, including the recovery of damages.

53.    Defendants' infringement is willful and intentional, making this an exceptional case, which entitles Terrebonne's to treble damages, attorneys' fees, and costs under 15 U.S.C. § 1117(a).

## COUNT TWO – Unfair Competition (15 U.S.C. § 1125(a)(1)(B))

54.    Terrebonne's realleges paragraphs 1-49.

55.    Defendants' deceptive acts and false or misleading statements of fact in commercial advertising and promotion constitute unfair competition under 15 U.S.C. § 1125(a)(1)(B).

56.    Plaintiff has been damaged thereby and is entitled to pursue all available statutory and common law remedies, including the recovery of damages and the disgorgement of Defendants' profits.

## COUNT THREE – Cyberpiracy (ACPA) (15 U.S.C. § 1125(d)(1))

57.    Terrebonne's realleges paragraphs 1-49.

58.    On information and belief, Defendants have registered, used, and trafficked in one or more domain names and mobile applications containing the Terrebonne's Marks

with a bad-faith intent to profit, in violation of the Anti-cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d).

59.    Plaintiff has been damaged thereby and is entitled to pursue all available statutory and common law remedies, including the recovery of damages.

### COUNT FOUR – Texas Common-Law Trademark Infringement & Unfair Competition

60.    Terrebonne's realleges paragraphs 1-49.

61.    Defendants' conduct also constitutes trademark infringement and unfair competition under Texas law. Defendants' unauthorized use of the Marks is likely to cause confusion, mistake, or deception as to the source, sponsorship, affiliation, or approval of Defendants' goods and services. In fact, Defendants' actions have already led to actual confusion amongst consumers.

62.    Plaintiff has been damaged thereby and is entitled to pursue all available statutory and common law remedies, including the recovery of damages.

### COUNT FIVE – Embezzlement

63.    Terrebonne's realleges paragraphs 1-49.

64.    Gibson owed fiduciary duties to Terrebonne's but wrongfully appropriated company funds and property for his own use, constituting embezzlement under Texas law, competed directly against Terrebonne's, using Terrebonne's own Marks, property, and funds.

65.    Plaintiff has been damaged thereby and is entitled to pursue all available statutory and common law remedies, including the recovery of damages and/or restitution.

## COUNT SIX – Theft & Conversion (Texas Theft Liability Act)

66.    Terrebonne's realleges paragraphs 1-49.

67.    Defendants intentionally and wrongfully assumed and exercised dominion over Terrebonne's property—including cash, seafood inventory, and other equipment—without consent, in violation of TEX. CIV. PRAC. & REM. CODE § 134.001 et seq.

68.    Plaintiff has been damaged thereby and is entitled to pursue all available statutory and common law remedies, including the recovery of damages and a mandatory award of attorney's fees to the prevailing party.

## COUNT SEVEN – Breach of Fiduciary Duty

69.    Terrebonne's realleges paragraphs 1-49.

70.    Defendants owed Terrebonne's fiduciary duties of loyalty, care, good faith, and candor. His self-dealing conduct, secret profits, and diversion of corporate opportunities breached those duties.

71.    In so doing, he has engaged in wrongful conduct that has adversely and materially affected the Company, and the Company has been damaged thereby. Plaintiff is entitled to pursue all available legal and equitable remedies, including the recovery of damages and/or a forced buyout of his membership interest.[1]

---

[1] Paragraph 7.1 of the December 10, 2024, Cross Purchase Buy/Sell Agreement specifies that the value of any minority ownership interest must reflect the "economic reality" of the business operations, which, in this case, would necessarily require the calculation of an offset against the minority interest's value, if any, for any harm done by a member in breach of his or its fiduciary duties to the Company. *See also* Company Agreement ¶¶ 13.01 and 13.15 (Company entitled to offsets regarding amounts owed to members, if any).

## COUNT EIGHT – Breach of Contract

72.     Terrebonne's realleges paragraphs 1-49.

73.     Gibson, individually and through WCC, is a party to the Company Agreement and other written and oral contracts. By the acts alleged above, Defendants materially breached those agreements.

74.     Plaintiff has been damaged thereby and is entitled to pursue all available statutory and common law remedies, including the recovery of damages and an award of attorney's fees, pursuant to TEX. CIV. PRAC. & REM. CODE 38.001 to the prevailing party.

## COUNT NINE – Unfair Competition (Texas)

75.     Terrebonne's realleges paragraphs 1-49.

76.     Defendants' conduct constitutes common-law unfair competition and passing off under Texas law.

77.     Plaintiff has been damaged thereby and is entitled to pursue all available statutory and common law remedies, whether legal or equitable, including damages and injunctive relief.

## V.  CONDITIONS PRECEDENT

78.     All conditions precedent to Plaintiff's claims for relief have been performed, have occurred, or have been waived.

## VI.  PRAYER FOR RELIEF

79.     Plaintiff requests that the Court enter a preliminary and permanent injunction restraining and enjoining Defendants, their agents, servants, employees, attorneys, and all

persons in active concert or participation with them, from engaging in the acts and conduct complained of herein, including without limitation: (1) using Terrebonne's name, logo, or Marks in any manner; (2) advertising or suggesting any affiliation with, sponsorship by, or endorsement by Terrebonne's; (3) withholding, misappropriating, or using funds or property belonging to Terrebonne's; (4) operating or posting to the internet, a social media platform, or a mobile application any content or advertising using Terrebonne's marks; (5) taking any action to disrupt or interfere with Terrebonne's business operations, including disparagement of the Company or trying to persuade employees to leave the Company; (6) competing, directly or indirectly, with Terrebonne's, soliciting its customers, or otherwise using its confidential information; and (7) otherwise infringing, misappropriating, or injuring Terrebonne's rights, reputation, and goodwill.

80.    Plaintiff further requests that the Court order Defendants to delete all existing posts and advertisements using the Terrebonne's name or logo and take all necessary actions to transfer to Terrebonne's (or otherwise transfer the right to control to Terrebonne's) any social media accounts, domain names, mobile applications, or other digital assets containing Terrebonne's name or marks, and to return all misappropriated property and funds.

81.    Plaintiff also seeks damages, treble or enhanced damages, an accounting, disgorgement of Defendants' profits, return of all stolen property, attorney's fees, costs, pre- and post-judgment at the highest allowable rates, and all other relief to which it may be entitled, including the equitable remedy of a forced buyout of Gibson's membership

interest, which is an available equitable remedy under Texas law when, as here, Gibson has committed and continues to commit egregious breaches of fiduciary duty.

## VII.  JURY DEMAND

82.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

Dated: May 7, 2025                          Respectfully Submitted,


                                            */s/ David A. Skeels*
                                            **David A. Skeels**
                                            **State Bar No. 24041925**
                                            **Email: DSkeels@whitakerchalk.com**

                                            **Richard L. Schwartz**
                                            **State Bar No. 17869500**
                                            **Email:  rschwartz@whitakerchalk.com**

                                            **Donald Ferrill, DVM**
                                            **State Bar No. 00784047**
                                            **Email:  dferrill@whitakerchalk.com**

                                            **WHITAKER CHALK SWINDLE & SCHWARTZ PLLC**
                                            301 Commerce St., Suite 3500
                                            Fort Worth, Texas  76102
                                            817.878.0500 Telephone
                                            817.878.0501 Facsimile

                                            **ATTORNEYS FOR PLAINTIFF TERREBONNE'S, LLC**